Alrighty, the next and last case for the day is our consolidated matter 1621 Route 22 West Operating Company v. NLRB And before the parties get started, I just wanted to apologize if there's any confusion about the amount of time you're going to have to argue So sorry about that, I hope that didn't cause any problem We'll be happy to hear from counsel now Good afternoon, at the heart of this case is an unfair election Somerset did not get a fair election and Somerset did not get fair and regular proceedings with regard to enforcement of the election The unfairness of the election is manifested by the fact that a union flyer on the eve of election falsely attributed to voting unit members that they were voting yes And I think that this is really at the heart of the case and it was the basis of Member Hayes' dissent I think it's important that we look at the release that went into this flyer This flyer represented that 30-some employees were voting yes and then with 20-some employees specifically, I'm voting yes But if we look at the release that those employees signed, that release does not include any statement or any question with regard to whether the employee intends to vote yes for the union In fact, the release is very artfully drafted by a very sophisticated union and filled out by employees, some of whom are not very sophisticated at all I'll speak for myself, I have to agree, some of the stuff seems kind of, you want to scratch your head a little bit and say wow But the Midland case seems to set a standard that a lot of these sort of, I'll categorize the area as shenanigans, are going to be tolerated What are the cases that you would like us to rely on, that I guess would form an exception to what Midland had to say? Well, I think that this falls squarely within the Van Doren Plastic Machinery Company and we also refer to the BFI Waste and Allegheny Flood Lump But the principle of Midland is that if you've got campaign literature that says, for example, in one of the cases, the union was voted in in the company across the street And they didn't get a wage increase. In fact, their wages went down. Okay, that's maybe a misrepresentation, but if that's a misrepresentation, the union comes back and says No, that didn't really happen, and it's up to the employees to decide for themselves from these two contrasting positions what the actual truth is That's not the situation that we have here. The situation here is much closer to, we think exactly, Van Doren because it is an artful deception that we couldn't counter and that misleads the voters And it also has an impact on the employee's Section 7 rights. But with regard to the misperception, the employees don't say, I'm voting yes. The employees are asked on the forum, how does having a union improve your life? Well, I could answer that the union would improve my life by giving me job security But also be thinking, well, it gives me job security, but I have to pay dues and I have to pay into the pension fund, so on balance, maybe I'm voting against the union. So, first of all, the employees never in these statements said, I am voting yes for the union and you union can use that in publicity. So, under Van Doren, that's a misrepresentation. Now, in this case, there's no way that the employer could counter that. Because we can't go to the employees and say, is it true that you're voting for the union? Because we want to make sure that this, we want to counter this, because we're violating the act if we go to the employees and say, is this true? The union had an obligation under Van Doren to verify the accuracy of the statements and there was absolutely no effort on their part to go back and verify the accuracy of the statements. In fact, I thought they had them sign a release form. Well, they did sign the release form, Judge, but the release form does not in any way indicate that the employee has represented that they're going to be voting yes. The release form doesn't say that the materials are going to be used in campaign literature in support of the union. It just says, you authorize us to use this information however seems fit. Why isn't that a reasonable belief? If they stood for the picture, I mean, they knew what they were there for. They weren't there for a Christmas card. They were there for a union election. That's right that they were there for a union election. Why would that be a reasonable belief that these people who signed the form were voting yes? Because they were never asked whether they were going to vote yes or not, Judge. And the employees have very important and strong Section 7 rights and they're discussed at length in the Allegheny case that declaring how you are going to vote is a very important vote. An employee has an absolute right to refrain from declaring how they are going to vote or not. Now, there's no indication here that any of the employees said that they were going to vote yes for the union. And in addition, we have to look at the issues with regard to those releases. Now, one of the people who witnessed the releases testified, frankly, that she made up the quotes on some of those releases. Not only did she sign releases as a witness that she didn't witness, but she testified brazenly that she made up some of the quotations. The employees testified during the hearing that there were a number of employees that said that they had never told anyone that they were voting yes for the union. Using the pictures and with the quote that they used, is that really artful deception? I mean, you didn't know that they were voting no. You didn't know that they were voting against the union. It seems to me that deception is a pretty strong word to try to get over in putting this brochure together. Well, respectfully, your honor, I do think that it's a deception because it indicates to the other employees that these of their colleagues have already committed to voting for the union when, in fact, they did not. And it was a false statement that Somerset had no way to legally question or counter. And remember, as Member Hayes said in his dissent, which I think is very important with regard to the Section 7 rights, that this misrepresentation of the employees' position puts them in an untenable position. First, it's advertised they're going to vote yes for the union, something that they have a right not to do. They have a right not to declare how they're going to vote. So what do they do then? In order to correct the misrepresentation, then they have to go out and declare that's wrong. I'm voting no. And so they're being forced into a position where either they go along with the misrepresentation, with the fabricated statement, or else they relinquish their Section 7 rights and stand up in front of their coworkers and say, no, I'm voting no. I'm voting against the union. And no employee should be put in the position of having to take that action. And that's what the Algenia case discusses. I have a question. Let's follow your argument all the way through. Let's assume that there's got to be a new election. How would that look? Because your adversaries point out that there's also an allegation that the unit scope has been changed improperly. Who would vote in the election if we unraveled this whole thing? Well, there are currently, as we indicated, as we learned recently, there are several LPNs that have been recently hired, and then there are other job classifications that are included in the unit in addition to the LPNs. So in a new election, it would include all the same job classifications, but they would be in different numbers. There would be a smaller number of LPNs. Let's have five minutes to her time, and maybe you can get to the other appeal. With regard to the other appeal, I'd like to focus on the remedy aspect of it. There are other points, but I think it's important to emphasize to the court the breadth of the remedy that was imposed by the NLRB in this case. It is very unusual, and we submit that it is totally inappropriate in the context of health care. The Supreme Court has recognized, and we all have seen it quoted so many times, that labor relations within the context of health care institutions is a different matter. It requires a delicate touch, as the Supreme Court has said. It doesn't violate any law, does it? It's just the policy, I guess you're saying, that would be violated? Well, we believe that it puts in conflict Somerset's obligations under the health care laws and the requirements of the NLRB. But the NLRB has told Somerset effectively in this letter, you can't use RNs to provide day-to-day patient care. You must use LPNs. Now, that's an extraordinary thing for the NLRB, which for all its expertise in the area of labor law, has absolutely no expertise in the area of health care. And by their remedy, they're saying, give this, quote, unquote, LPN work back to LPNs. They are dictating to Somerset and to the physicians and to the experts that have determined, without contradiction, that the RN model is a better model for patients. They're saying, forget about it. You have to care for all of your patients using LPNs. You can't improve and try to improve by using RNs. It's like the NLRB saying, okay, Alito, you go to the hospital and you want to see an orthopedist, but you can't see an orthopedist, you have to see a generalist. That's exactly the nature of the decision that the NLRB is making in this case with regard to its remedy. Now, they say the Third Circuit has already decided this in Somerset 2, but this case is not Somerset 2 because it's a very different remedy. In Somerset 2, the issue was the reinstatement of specific employees. Okay, so what you're dealing with there was, is Jillian Chock a bad enough employee and dangerous enough to patients that she shouldn't be reinstated? And the court disagreed with us and said, okay, you must reinstate Jillian Chock and you must reinstate other employees. But that's not what we're dealing with here. It's not just a question of which LPN is going to provide the care to the patients. It's taking it very much further and saying, Somerset, you no longer, you and your physicians and your experts can no longer decide what health care professional provides care to your patients. That's now our decision. You must use LPNs. Didn't this court reject a similar argument on the remedy question in Somerset 2? I don't think it's a similar question, Judge Fischer. It had to do with the remedy, and we did argue in Somerset 2 that particular employees should not be reinstated even if they were found to have been improperly terminated because of the nature of their conduct. But here we're talking about something much broader and much more important and I think much far afield because it's not just a particular employee. It's not just a decision of which LPN is going to render services. It's a deep intrusion into the business of health care where the NLRB wants the court to substitute its judgment about how to provide health care for the opinions of the professionals. I think it's night and day from Somerset. Can I ask you a question about another part of Somerset 3, and that has to do with the NLRB general counsel question and Mr. Solomon's tenure. When Mr. Griffin was confirmed and then came along and may argue any alternative, even if it's not extraordinary circumstances, that Mr. Griffin ratified Solomon's actions. Do you think that kind of blanket ratification is sufficient under our jurisprudence? We submit that it is not, Your Honor. Under advanced disposal, we submit that you need to have what is envisioned as an independent and detached evaluation of the decision, and that's not what we have here. We have here a form ratification that was issued a few days after Somerset made its motion to dismiss before the board. It is, as we pointed out in our brief, exactly the same as what was issued in apparently a great number of other cases. There's nothing here. Everything that we can tell from the record indicates that this was a pro forma ratification. It was just done out whenever anyone raised this issue, and I think that that doesn't meet the standard that this Court established in advanced disposal, and it really makes a mockery of the holding now of the Supreme Court in affirming the D.C. Circuit in the SW case. It could be argued that advance talked about a presumption of regularity here, but since this is here for us on a petition for review, how would you best be able to rebut that presumption of irregularity? Well, that's the problem, that you find yourself in this situation, and what we've pointed to is we can't take discovery within the NLRB at this point and see what exactly occurred, but based upon the public record of the timing of the ratification, the form nature of the ratification, the fact that the ratification was identical in a large number of cases. How large a number is that? Does the record show how large that number is? We don't know that we have gathered together all of the instances in which the same ratification was used. I can check the number that we located and give Your Honor that number. You can take judicial notice of whatever the number is? Yes. See, your colleague actually has the piece of paper there. Ah. Lest we forget what we were talking about. Yes, the instances that we were able to locate were on page 51 and 52 of our brief with citations to the record, so because they are reported decisions, this court can take judicial notice of them. The health and safety issues are obviously very important here, as is the requisite training and skill and the variance between the LPNs and the RNs. The union or the NLRB has said that, well, let me ask it this way. What is it about Somerset that was significantly different from the other 27 unit facilities that were part of this group? Why were the RNs needed there and not needed, at least exclusively? And did you really change the acuity level of the patients after that change was made? Two reasons why the RNs were more necessary, it seems. The first was that Somerset had a high acuity level of patients. Even before it switched to a totally subacute building, it had very high acuity levels. Second, it had, frankly, a very poor history of performance on the inspections that are done by the New Jersey Department of Health. And in 2009, it had two G tags, which mean actual harm to patients. And, you know, as we've pointed out, one of those instances of actual harm to a patient was attributable to Joanne Jock, who was the person who testified that she made up quotes for the releases. She failed to conduct a pain assessment on a patient with rectal cancer who was admitted to the facility. The patient was in so much pain that he told the New Jersey Department of Health that he wadded up towels and stuck them in his mouth so that the fellow patients couldn't hear him scream with pain. That's not something that we wanted. We had a bad inspection in 2009. 2010, there were no G tags, but there were 21 other violations found. Somerset made a concerted effort through a variety of ways, through training, through new programs, through progressive discipline to remove employees, and finally to move to the RN model to improve patient care before something really unfortunate occurred. So why don't you just notify the union? It sounds like that's the, you know, rather than take unilateral action. Is it because you believe that they weren't properly certified and it was unnecessary? At the time that the decision was made, the union was not properly certified. And additionally, we think that under the case law that we cited in our brief, that we were at the same time as making these efforts to improve care, that we were changing the focus of the business, moving from a business that took in both long-term care and subacute care patients and that we were going to be totally focused on subacute care, which changed the fundamental direction of the business. And under those cases that we cited, we had no obligation to bargain with the union in order to make that change. Okay. Thank you. We'll hear you out in a little while. We'll give the other side 20 minutes as well. You can split it any way you like. Okay. I'll still take, I guess I'll take 15 and the union can take five. Okay. Good afternoon, and may it please the court. My name is David Casserly for the National Labor Relations Board. I'd like to start by addressing Southwest General and the effect of the general counsel's ratification here. As a first initial point to make, Somerset's challenge to the ratification in this case was waived before the board, and the board explicitly found that it had waived its challenge by not bringing it up in exceptions to the board's decision. Indeed, it didn't bring its challenge until two years, more than two years after exceptions were due. But isn't the actual decision an extraordinary circumstance in itself to allow it to go forward? Your Honor, this court rejected that claim in Somerset 1, so this court did not find it preserved in Somerset 1, and in that case, if it were an extraordinary circumstance, that would excuse not bringing it up to the board at all, right? So they could have brought it up in Somerset 1. And even if it were, we're talking well after the decision issued, and certainly well after the initial district court decision that led to the Ninth Circuit case issued. But it filed its objection in a motion to dismiss. Yes, Your Honor. Before the board. So it did file it before the board. It didn't file it for the first time before us. That's correct, Your Honor. But it wasn't properly filed before the board. The board's, nothing in the board's procedure. I mean, it was fully litigated, wasn't it? It was fully litigated in that it was filed before the board. I don't believe the general counsel answered it on the merits. But to be clear, the board didn't address the merits of the motion. The board found it was moot because of the ratification and found that it was waived. Well, so the board had a chance to address it. The fact that the board chose not to address it doesn't mean that it's waived. Well, Your Honor, the board found it was, and first of all, several points in response to that. First is that the board's rules and regulations don't allow motions to dismiss. There's no provision for them before the board after exceptions have been filed. And, indeed, the provision for exceptions states that everything must be included in those exceptions. And whether the board could possibly have considered something that's not done in accordance with those rules, it's not an abuse of discretion for the board to decide to follow its rules and not consider the merits of something in that situation. Also, in advance disposal, this court found that the fact that a claim that was raised late in footnote 4, this court mentioned that in advance of scope disposal, the claim had issued there about the regional director's authority to issue the complaint had been raised untimely to the board, and the court had no issue with applying the 10E bar to it. The court found extraordinary circumstances there, but still needed to find an extraordinary circumstance. It was still not considered raised to the board for the purposes of Section 10E of the Act. Moving on to the ratification here, as far as the point about a blanket ratification goes, in advance disposal, the ratification at issue was a ratification, a single ratification of the regional director's prior moves that he had made before he had been properly appointed. Here, in this individual case, General Counsel Griffin issued a ratification that stated, after proper consultation with the staff, he believed that the issuance of the complaint was a proper exercise of discretion. And how many cases were those ratifications issued? I don't know the full number, Your Honor. Hundreds? Probably not hundreds, Your Honor. I really don't know what the full number is. It's certainly, you know, this is not the only case we have a ratification, and there's certainly several. Is it dozens or hundreds? Which one would you say it's closer to? I would say probably not multiple hundreds of the ones I know of. I've certainly seen maybe a couple dozen. It would take a lot of work, though, for Mr. Griffin to go over all those cases, would it not, to make an independent judgment? Well, Your Honor, yes. And shouldn't somebody at least look at that question? I don't know that we're in a position, we can't create a record. Shouldn't at least the Board look at that question as to whether or not they were properly ratified? Well, Your Honor, two things in response to that. First, in terms of how long it would take the General Counsel to determine whether something was a proper use of the General Counsel's discretion, normally in a case like this, the General Counsel does nothing in this kind of case to indicate that it's a proper use of discretion. The General Counsel delegates that authority to his Regional Director. So the fact that a properly appointed Regional Director signed the complaint might very well be enough, we don't know, but might very well be enough for the General Counsel. So the idea that there needs to be a lot of time. Second, there's no evidence that any of these other ratifications even happened on the same day as this ratification. Third, shouldn't there be a mechanism by which this can be evaluated, rather than the NLRB just merely saying it's been waived and you need to assume it was done right? Because that's what it seems like you're saying. Yes, Your Honor, that is what I am saying. And I believe the presumption of regularity supports that. Here, what the presumption of regularity means is that when a government official says, I have done this for this reason, that is true unless somebody can bring a reason to look at that or show some evidence that it's false. Here, there's no evidence that he didn't look at the ratification and do exactly what he said he did, which was consult with his staff and determine that it's an appropriate issue of discretion. Also, the discretion here that we're talking about is very, very broad. Under Section 3D, the General Counsel has discretion to issue complaints, and it's not reviewable by anybody, including the Board. The Board can dismiss the complaint after, but it can't say this complaint should never have issued. And so given that, it seems it would be odd for a court or for the Board to probe into the General Counsel's reasons for issuing a complaint or for deciding that a complaint was proper when the Board never does so. Do you mind dealing with some of the issues your adversary talked about in the 2012 action or appeal? Yes, Your Honor. So first, I'll just... I'll start with what I said to your adversary. You read this stuff. I understand propaganda is going to be okay, but does this go a little beyond propaganda? No, Your Honor.  It has the union's emblem on it. It has the union's name on it. There's nothing about this. No witness testified that they could not identify this for what it was as propaganda. And that is exactly what the Midland Standard is about. It's about the Board doesn't, as long as it's recognizable for what it is, which is propaganda, the Board doesn't go into that deeper and look into...  I'm sorry, Your Honor? Falsification? Misrepresentation or falsification? Your Honor, falsification only comes into play in the Midland Standard when it is falsification as to whether or not the document is a piece of propaganda. For instance, if the union had put the NLRB's logo on that piece of paper instead of their own and said the Board says that we want you to vote yes or something along those lines, that's a forgery. That's the kind of misrepresentation that under the Midland Standard is not enough. And here I should mention that the Court has approved the Midland Standard as reasonably consistent with the Act. Well, now, I'm sure you remember Hayes' dissent. Member Hayes brought up some pretty good points, I thought, that by saying I'm voting for the union, it may violate their right not to have their vote publicized and several other things. How do you respond to that? Well, Your Honor, there's no evidence here that any actual... First of all, this is a secret ballot election, so there's no... It's more than hypothetical where an employee goes and says I'm voting for the union at one point and other people repeat that and then later on... Well, it's more than hypothetical. It's I'm voting and there's a picture of the person. I don't know how much more explicit you can be. Well, the hypothetical part is when the employee then doesn't vote for the union, would they feel compelled not to? But nobody's going to know that they did not vote, that any individual employee didn't vote for the union. So the being compelled argument doesn't really make a lot of sense in that regard. In terms of... You need that kind of testimony to rebut this? Yes, Your Honor. Under the Midland... Well, this is actually a slightly different issue that Member Hayes brought up. Either that or if there's evidence that either the union or the employer coerced an employee into stating publicly that they voted yes, that's been considered objectionable in the past. But there's no testimony here that any employee was coerced into signing these release forms or into stating that they supported the union. So it's okay if you trick the employee but not coerce them? Your Honor, there's no trickery going on here. What we're talking about here is signing a release form that the union distributes that states that the union will use their names in its propaganda. And so the idea that these employees who don't support the union would be signing that piece of paper just does not make much sense. It's reasonable for the union to look at that and say, okay, these employees actually do support the union. Moreover, many of these employees even appeared in a video stating their support for the union in addition to this. All right. I'd like to move on to the issue of the remedy that Ms. Alito addressed since the court had some questions on that issue. First of all, the earlier Somerset case that this court enforced of the boards is not exactly on force with the remedial issue here. But what that case does say is when you're dealing with the board's right-line standard under which the company has an affirmative defense that they would have taken the action at issue regardless of any union activity. That's the affirmative defense under a right line. If the company can't meet that affirmative defense because the reason they put forth is false, they can't then put forth that exact same reason as a challenge to the remedy. And that makes sense because if an employer can't show that it would have taken an action because of, say, patient care anyway without any union there, then they should not be able to say afterward, well, we can't reinstate these employees because of patient care when these employees would have been there without a union present or without their union activity. So given that here, that's exactly the situation we're dealing with. Somerset failed to show before the board that it took this action because of the employees' union activity. Sorry, failed to show that it took this action because of business reasons unrelated to the employees' union activity. And there's no contention here that those business reasons are any different from their challenges to the remedy that they're bringing. It's the same patient care challenges that they brought to the board. Moreover, the idea that they've changed. And what were the business reasons? Well, the main one they brought to the board, Your Honor, was that LPNs can't handle the acuity of the patients at Somerset. And so how do we factor in the bad reports? Two years running. Well, first of all, Your Honor, the 2009 report, the administrative law judge in the previous case found that that report was actually fairly routine and that Somerset had exaggerated the deficiencies there. This court enforced that order. Moreover, it's just the timing doesn't make sense with those reports being what motivated this action. You know, those reports were negative, as you mentioned, supposedly negative, as you mentioned, as of 2009. This action took place instead in April of 2011 or May of 2011. Moreover, there's no evidence that any other health bridge or care one affiliated location took such an extreme solution to having a negative state survey. Did the others have the same kinds of evaluations? There's no evidence in the record about evaluations anybody else received, Your Honor. And again, this is an affirmative defense that the company must prove. But do they have to show what all the other – is it up to them to point out evidence relating to the other 27 facilities or is it – Your Honor, what's up to them is pointing out evidence that is sufficient to show that they took this task, that they took this action, or would have taken it absent union activity. And that's what they didn't show. How they went about doing that is not really something the board is going to probe into. It's either sufficient or it's not. And here it wasn't sufficient. Moreover, it's not uncontroverted that switching to RNs improved patient care. Indeed, there's credited testimony in the record that the RNs that Somerset initially employed, all of them had been let go after just a few months, except for one who had eight patient care-related deficiencies in that time. There was testimony that these new RNs who came in, because they paid them at the same rate they paid LPNs, they couldn't find anybody who was equally experienced. And so these RNs had to be trained by the LPNs who were there and didn't know how to do basic tasks such as even passing an IV. So there's just not enough in the record to support their affirmative defense there. I think you can answer the question I asked your adversary. If we agree with your adversary on the first appeal, Somerset won, and say that there's got to be a new election, right, how would that all work? It would just be who's ever in the bargaining unit right now? Well, Your Honor, we believe that the 883 violation in the second case would still be— the court could still enforce on that. In other words, that's something—it's illegal for an employer to take an action because of anti-union animus, regardless of whether there's a union in place or not. Indeed, in the first Somerset case that this court already considered, that was the case. This was some pre-election activity. So because of that, those positions, if the court enforced on that issue but overturned the election, those positions would be restored. It would be a pretty complicated election to run, but that's how it would shake out. Thank you, counsel. I think he's got five minutes, right? Okay, thanks. Good afternoon. May it please the court. My name is Patrick Walsh on behalf of the Intervening Union. As the court noted in some of its earlier questions, first with respect to the campaign propaganda, the court is aware that there's a very high standard, and a party who seeks to overturn a board election bears a heavy burden. You have to first show not only that there were irregularities, but that these irregularities created a coercion to the degree that it impeded free and fair choice. The record is completely devoid of any evidence that any voter was impeded in free and fair choice when they voted at the election. With respect to the alleged misrepresentations, I want the court to focus very carefully on the hearing officer's fact findings. The hearing officer held 11 days of a hearing and painstakingly analyzed testimony and evidence, and what the hearing officer found was that there were 49 people who signed releases, and there was one person for whom there was no release. That person had testified or had affirmed union support in other contexts, and there was one person for whom a quotation was not found in the original release. But none of them actually asked them, are you going to vote for the union? Check yes, no, right? It was supposition that, well, they're talking positively about the union. They're going to vote for the union. That's correct, Your Honor, and really there's a legal answer to this and a factual answer. First, the board has found in at least two other cases, one recently decided in 2014 after briefing Durham School, that this very type of statement, we're going to vote yes, when that was not a question posed on a release form or a petition, is not inappropriate. GORMAC is another case of this type of language. But as a practical matter, as the court noted, these employees were involved in a heated election campaign. They knew they were not showing up for a Christmas card photo, as the court noted. They knew that when they told the union that you can use my photo in future literature and it may be worth actually reading what the release said, I hereby give to 1199 SEIU my permission to use pictures made of me and comments made by me on this date in videotapes, printed material, digital and online media, et cetera. There was no time limitation on it. There was no one usage on it. And these employees knew that if they signed that release and gave the union that authorization, that they were going to be identified as union supporters. And in fact, when you review the answers to the questions that they filled out, again, the hearing officer found that they substantially were the same or almost identical with what ended up in the campaign literature. They were statements that clearly demonstrated support for the union. So the notion that these were employees who somehow had been hoodwinked, that by signing a release when they were actually opposed to the union, would somehow be shaped into supporting the union, these were people who were attesting to their support for the union. And in the DORM case, that's exactly what the board says. They said that the signing of the release alone, even though people didn't say in the release, yes, I will vote for the union, was sufficient for the union to infer that they supported the union. That's an NLRB decision? Yes, it is, Your Honor. Is DORM like DORM North Carolina? Yes. I can give you the citation. It was decided after briefing. 360 NLRB number 108. DORM School Services is the name of the case. And what was the other case? Gore-Mack. Gore-Mack, which is cited in the briefs. And this leads us to the standard and the important underlying position of Midland Life, which is that employees are mature adults, and they can tell propaganda when they see it, and they can decide what to do with it. And that's why the board came to a very carefully considered decision as to how to assess campaign propaganda. It did so with the guidance of A.J. Tower, where the Supreme Court noted that an important concern in these types of certification challenges is resolving things quickly, certainty, finality. And this court has long adopted the same exact standard for the same reasons. St. Margaret's is an example. And in all of these cases, the point that the board makes and the courts repeatedly make is we're going to trust employees to be able to assess what propaganda is. There are only two occasions when you'll overturn an election based upon misrepresentations, even if there are misrepresentations. One is if there's forgery. Not misrepresentations. If there's forgery, there's no argument here that there was forgery. The only other example is the Van Dorn standard. And it's interesting. When the court asked an employer's counsel what cases should we rely on, they mentioned Van Dorn and BFI. These are both decisions in which the election was not overturned. But these cases, Van Dorn is a Sixth Circuit case. It doesn't necessarily even apply in this circuit. But in Van Dorn, all Van Dorn says is that if there's artful deception or pervasive misrepresentation, then you'll engage in an analysis. We have no record evidence of any kind of pervasive misrepresentation. Again, one person didn't sign a release, but that person attested in other forms to their union support. And one person, the quotation, she didn't remember the quotation, but she, in fact, had signed the release. I see my time has run out. There were a number of other issues that the court raised, which I'd love to address. Well, we already gave. We'll give you another minute if you want to add something else. Your Honor, in terms of what this would look like if there were a new election, I think it's important to realize that if there were a new election, after there's already been a free employee choice now almost seven years ago, it would undermine the entire purpose of the Act and the purpose of free employee choice here. But there has been turnover, and as the court knows from the last Somerset case, it's as a result, in some measure, due to the unfair labor practices and pervasive unfair labor practices of the employer. The employer now freely acknowledges that it hires LPNs. It was always a pretext that they had to get rid of the LPNs. They did so shortly after there was a 10-J petition filed to reinstate the LPNs that they'd fired. LPNs whom this court has found were fired unlawfully. So to have a new election when there's been this degree of unfair labor practice and findings against the employer, which has impacted free employee choice, would undermine employee choice both by not respecting the initial choice the employees made and by having an election after the employer has essentially benefited from its own wrongdoing. I don't want to press my luck with my time, Your Honor. That would be better. Thank you.  Thank you, Your Honor. Okay. Thank you. With regard to the argument with regard to waiver challenge with regard to Mr. Solomon's appointment, the general counsel did oppose the motion to dismiss before the board in response to a question of Judge Fisher that counsel did not know the answer to. That appears in the appendix at 2196. With regard to the issues of the LPN conversion, counsel has said that the 2009 survey by the State of New Jersey was fairly routine. It's not fairly routine to us. It's not fairly routine to any health care provider. It may be to the NLRB, but to have the State of New Jersey find that there were two instances of employees suffering actual harm because of the actions by employees, one of whom is Ms. Jillian Jacques, that's not routine and that's not something that any health care provider wants to see continue. On that issue and with regard to the use of RNs, there was extensive expert testimony in the 10J, and that expert testimony was admitted into the record with regard to the LPN conversion case. And that was given short shrift by both the administrative law judge and the NLRB. And the important thing about that is that the expert that was brought in by the NLRB agreed with Somerset that the RN model is far superior and that the trend in health care is to move more towards the use of RNs and not to use the LPNs. So that evidence was completely disregarded. Is there any significance that LPNs have been hired recently? There was a recent hiring of a few LPNs because of a shortage of available RN applicants, and that was the only reason. The goal still is to maintain all RN workforce, but we were, my understanding, compelled to hire some LPNs because of a shortage of RN candidates. So they are there in the workplace, and that was the reason for our letter to the court. With regard to the election, I want to clarify the standard. And reference was made to this court's decision in the St. Margaret's case. And yes, the court in that case applied the Midland Standard, but the court also reviewed Van Doren and the other circuits which have found that in appropriate circumstances where there is an artful deception and where it's pervasive, that that is enough to invalidate the election and that Midland is not an always applicable rule. And this court noted that in an appropriate case that that other standard, which I'll call the Van Doren Standard out of the Sixth Circuit, should be applied. How about counsel, the Durham School case that your adversary talked about for a little while? I don't know if you're familiar with it. I am, and that case does not meet the Van Doren Standard because at issue there was only one employee. It was not a pervasive representation. And, you know, here, it's not just one employee. It's three employees who said they had never signed release forms. It was Jillian Jock saying that she made up quotations. It was the hearing officer crediting the testimony of Dandy, Rice, and Moore that they never told anyone associated with the union that they were voting yes and that they never authorized the union to publish that statement. You know, here, we're not talking about one employee as in the Durham case. We're talking about 33 employees under the we're voting yes and 20 some employees under the I'm voting yes. And only 38 actually voted yes, right? Yes. Okay. In the union. Yes. And that included classification. Yeah. That's less than the number who said I was going to vote yes, right? Wait, hold on. No, no, because the total was 33 and then within that there were the 20 with the specific I'm voting yes. Thank you so much. Thank you, counsel. We'll take the case under advisement.